IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| **Christopher Grigsby,** <br>             **Plaintiff,** <br><br> v. <br><br> **FreedomRoads RV, Inc.,** <br>                **Defendant.** | **Case No.** <br> **Judge** <br><br> **Jury Demanded** |

## COMPLAINT

Plaintiff, Christopher Grigsby, by and through undersigned Counsel, alleges the following against Defendants, Freedom Roads RV, Inc.:

## JURISDICTION AND VENUE

1. This Court has jurisdiction over Plaintiff's federal claims pursuant to 42 U.S.C. § 2000e- 5(f)(3) (Title VII), 28 U.S.C. § 1331 (federal question), and 28 U.S.C. § 1443 (civil rights). This Court has supplemental jurisdiction over Plaintiff's state law claims, pursuant to 42 U.S.C. § 1367.

2. Venue is proper in this District, pursuant to 28 U.S.C. § 1391(b), because the Defendant resides in this District and a substantial part of the events or omissions giving rise to the claims alleged occurred in this District.

3. Mr. Grigsby filed a charge of discrimination with the IDHR on April 9, 2021. (Exhibit A). He received Notices of Opt Out of the Investigative and Administrative Process, Right to Commence and Action in Circuit Court or Other Appropriate Court of Competent Jurisdiction, and Order of Administrative Closures for the Defendant. (Exhibit B). He further perfected his

1

federal claims at the EEOC and received a letter of Right to Sue Against the Defendant (Exhibit C). This suit is timely filed.

## PARTIES

4.     Plaintiff Christopher Grigsby is a 49-year-old male who resides in DuPage County, Illinois. Mr. Grigsby started working for Freedom Roads RV, Inc. d/b/a Camping World at the end of January 2020 as a General Sales Manager of Camping World Chicago. At all times relevant to this Complaint, Plaintiff has been an employee as defined by Title VII and the IHRA. 42 U.S.C. § 2000e(f); 775 ILCS 5/2-101(A). At all times, Plaintiff was eligible for the protections of FMLA. He worked over 12 months and for at least 1250 hours during the previous 12-month period.

5.     Defendant, Freedom Roads RV, Inc. d/b/a Camping World, (hereinafter as "CW") is operating within Cook County, within the State of Illinois. CW employs at least fifteen (15) or more employees on a continuous basis. CW is and was at all times relevant to the Complaint, Plaintiff's "employer" as defined by Title VII and the IHRA. 42 U.S.C. §2000e(b); 775 ILCS 5/2-101(B). Defendant is an employer within the meaning of the FMLA, employing more than 50 employees for each working day during each of 20 or more calendar workweeks in the current or preceding calendar year in an industry affecting commerce.

## FACTUAL ALLEGATIONS

6.     Mr. Grigsby began work at CW at the end of January 2020.

7.     Mr. Grigsby spent the entire month of February at the Oklahoma City location for training. He started at CWC the first week of March 2020 as the General Sales Manager.

8.     At this time, Mr. Grigsby was paid a monthly flat guarantee of $10,000.00 for the months of February and March. Beginning April 1, 2020, his pay plan as the GSM was a $48,000.00 salary, plus a 3.5% of RV Sales Gross Profit, plus 1.0% of Finance Department Gross Profit, plus

$250.00 monthly bonus for Google Review over a 4.0 rating or 500.000 monthly for Google review over a 4.5 rating.

9. At the end of April 2020, Camping World promoted Mr. Grigsby to the General Manager of Camping World of Chicago with the same pay plan as above.

10. On January 1, 2021, CW changed Mr. Grigsby's pay plan to the actual general manager pay plan which was a $60,000.00 salary paid monthly, plus 6.6% EBITDA to be paid quarterly.

11. Mr. Grigsby's efforts in staffing, training, changing the culture, increasing sales volume, profitability and more resulted in CWC having a 1.5 million net profitable year in 2020, which was a 1.8 million turnaround from 2019, under previous management.

12. At the very beginning of February 2021, during an all-hands management meeting at CWC, Mr. Ed Lowitski, Finance Manager, referenced a story about a lady with a baby in his office "pulling out her tit to breast feed," while walking directly next to Ms. Elia Wilberg, CWC's Office Manager and gesturing with his hands.

13. Mr. Lowitzki already had a history of insubordination (e.g. telling a member of management to "fuck off," etc.) and harassment (e.g. singling out Ms. Wilberg through verbal abuse).

14. Mr. Grigsby tried to work with him up until the breastfeeding comment and had counseled him many times about his wholly inappropriate behavior, but Mr. Grigsby initiated termination proceedings with the approval of Michael Waddington, HR (Mr. Baker, Mr. Grigsby's supervisor, had been on vacation that day).

15. Mr. Waddington gave Mr. Grigsby immediate approval based on CW's sexual harassment policy to terminate Mr. Lowitzki, which he did.

16. Within days of terminating Ed Lowitzki, Jake Cooper, Business Development Administrator, also severely violated CW's sexual harassment policy.

17. Mr. Cooper said to one of the female employees, Holly Fabbie, "Hey, Holly! I was driving back to work with Terry Turchin and I asked him who's pussy he'd like to lick? I told him I want yours."

18. Mr. Grigsby was off that day, but he received calls from management and from Ms. Fabbie explaining what happened. Once again, he consulted with Mr. Baker and Mr. Waddington, and with their full support and agreement, Mr. Grigsby terminated Mr. Cooper.

19. Following Mr. Cooper's termination, both Mr. Waddington and Mr. Baker interviewed some employees about the matter during the course of a full work day.

20. At the end of the day, Mr. Waddington told Mr. Grigsby, that he had talked to numerous people, including Holly Fabbie, and it was clear that these were serious offenses and that Mr. Grigsby handled them properly. Mr. Waddington told Mr. Grigsby, "Good job."

21. During two in-person visits in March, Mr. Baker (Mr. Grigsby's superior) told Mr. Grigsby that he had a part in these sexual harassment incidences.

22. Mr. Baker asked Mr. Grigsby, "Why would these guys feel like it would be OK to say these kinds of things? Why do you have a culture here where they would think it's ok?"

23. Mr. T.J. Smith, Divisional President, was present at one of these visits and told Mr. Grigsby, "You have a culture problem here and you need to fix it."

24. Mr. Grigsby replied, "I've been cleaning up messes you guys have had since before my time. Michael and Ron interviewed people here and have confirmed these were legit issues and they were handled properly. Furthermore, I invite you to interview people yourself while you are here to get their candid feedback about the amazing culture we are creating."

25. Mr. Smith replied, "That would go very bad for you."

26. Following Mr. Cooper's termination, Mr. Cooper started contacting CWC employees about Mr. Grigsby. Mr. Cooper texted Mr. David Grant, Service Advisor at CWC:

> Watch your back. I had a call with Jason Shipley [believed to be Mr. Cooper's uncle] and HR after they let me go today. They are looking into Chris and how he has been

4

letting go of a lot of people from Keith's regime. I learned a lot about the rules and the process and Chris knows it well and is baiting the people that don't kiss his ass… (Exh. D).

27. Mr. Cooper sent the following a few days after his termination to Will Gordon, a detailer at CWC. "Should I fuck shit up for Chris? […] It's been taking a while, but be on the watch for more things happening. Chris is sweating bullets right now. He's going down." (Exh. E).

28. Based on information and belief, Mr. Cooper also created phantom Google accounts to discredit and harass Mr. Grigsby on CW's Google review page.

29. Mr. Grigsby brought this to Mr. Baker and Mr. Waddington's attention; Mr. Waddington stated that he spoke to Mr. Cooper about it, and that he would reach out to Jason Shipley, believed to be Mr. Cooper's uncle.

30. In July 2020, Mr. Grigsby hired Amber Grossich for a full-time receptionist position.

31. Going into fall 2020, Ms. Grossich had significant attendance issues and was counseled by Mr. Grigsby and others on different occasions. In January 2021, Mr. Grigsby and Ms. Elia Wilberg, office manager, met with Ms. Grossich to document her accountability issues.

32. Shortly after that meeting, an employee shared a SnapChat conversation she had with Ms. Grossich.

33. [I]dk yet for sure or not I just can't take it there anymore. Like the drama and the bs and the management is straight ass I have never dealt with shittier management in my life. Alot of people are lowkey thinking about leaving and I dont blame them one bit. That place is going down the shitter… (errors in original). (Exh. F).

34. When Mr. Grigsby mentioned to Mr. Baker that he intended to fire Ms. Grossich for her attendance, insubordination and ranting on SnapChat, Mr. Baker told him, "You cannot fire her. You have let too many people go, you are on a radar you do not want to be on."

35. One week after he was terminated, Mr. Grigsby learned that Ms. Grossich was let go.

5

36. During an all-day visit to CWC on April 6, Mr. Josh Smith, Market Manager, told Mr. Grigsby, "You have let far too many valuable people go!"

37. When Mr. Grigsby pushed back on that statement, Mr. Smith said, "If T.J. and Ron couldn't convince you, then I won't even try. But whether you agree or not, you have."

38. These comments made directly to Mr. Grigsby told the story of his upcoming termination; because he opposed sexual harassment, Mr. Grigsby was to be punished.

39. On Tuesday, March 30, 2021, Mr. Grigsby was stepping into a motorhome as the power steps were coming out.

40. His foot got caught in the stairs. He tried to "walk it off," but his foot got increasingly worse.

41. The evening of April 6, Mr. Grigsby had a conversation with his elderly mother in Ohio who told him about the severity of her and her husband's health conditions.

42. It was necessary for Mr. Grigsby to travel to Ohio to tend to the health of his parents.

43. Mr. Grigsby called Mr. Waddington immediately on the morning of April 7 and advised him of his plans to take the weekend to care for his parents and to potentially take FMLA to care for his parents for a longer duration.

44. On April 12, Mr. Waddington emailed him the Unum request document for FMLA.

45. Mr. Grigsby drove back home on April 8 to go to the doctor for his foot.

46. At his doctor's appointment that same day, he learned he had fractured his foot.

47. After seeking treatment and picking up his wife and kids, he drove back to Ohio to care for his parents.

48. Prior to his termination, he started the worker's compensation claim by sending all documents required to Mr. Baker, Mr. Smith, and Mr. Waddington. (Exh. G).

49. On the evening of Sunday, April 11, Mr. Grigsby emailed Mr. Waddington, Mr. Baker, and Mr. Smith giving them an update, as directed and promised.

6

50. Mr. Grigsby advised them of his needs to initiate FMLA for the remainder of April, and then to review if needed. On April 11, Mr. Grigsby wrote Mr. Waddington, Mr. Ron Baker, and Mr. Josh Smith, "I think right now the best option is to assume this leave for the remainder of April, effective Monday 4/12/2021." (Exh. H).

51. On Monday, April 12 at 8:32am, Michael Waddington emailed Mr. Grigsby the Unum paperwork to initiate FMLA.

52. Later that day, April 12, Mr. Grigsby was terminated via telephone.

53. Mr. Baker stated on the termination call, "Hey man, we have reviewed March and the previous months, and we are parting ways."

54. Mr. Baker also stated that Mr. Grigsby was to be paid the full commissions owed for the quarter, including what the company would normally "bank" or carry forward to the next quarter.

55. Mr. Baker's statement about "reviewing March" being the basis for Mr. Grigsby's termination is completely unjustifiable because in fact the opposite is documented. March 2021 was significantly over March 2020 results; March 2021 was a very successful month with regard to over $800,000 in total gross profit, and nearly $300,000 in net profit. March 2021 was, in fact comparable to a peak summertime month in 2020.

56. Moreover, Mr. Grigsby had received no reprimand, verbal or otherwise at this point.

57. Following Mr. Grigsby's termination, Mr. Cooper wrote to multiple employees and former CWC employees via text and Facebook Messenger.

58. Mr. Grigsby attained a copy of one of these messages between Mr. Cooper and Mr. Liam Fekete from Ms. Wilberg.

59. Mr. Cooper wrote, "We got him. Chris is fired," to wit Mr. Fekete replied, "Only reason he was fired is because he was missing work due to his sick dad. He was fired Friday." (Exh. I).

60. Mr. Cooper said, "He made that up to sound like a victim. Me and others have been working with HR and lawyers for months now with evidence of harassment, favoritism, drinking on the job, etc. and we got a law firm to pick up the case. They spent all this time investigating and finally called today to let us know he was let go Friday." (Exh. I).

61. Mr. Cooper's comments, if true, show that CW employees engaged in a smear campaign against Mr. Grigsby because he opposed sexual harassment.

## CLAIMS FOR RELIEF

I. **Retaliation for Reporting/Opposing Sexual Harassment in Violation of IHRA (775 ILCS 5/6 - 101(A))**

62. Plaintiff re-alleges Paragraphs 1-61 and incorporates them as though fully set forth herein as Paragraph 62.

63. Mr. Grigsby was terminated and his unemployment was unjustifiably challenged because he opposed what he reasonably believed to be sexual harassment committed by Mr. Ed Lowitzki and Mr. Jake Cooper when he terminated them due to their sexually harassing conduct.

64. At all times, Mr. Grigsby met the legitimate expectations of his employer.

65. Mr. Grigsby legitimately and reasonably believed the acts committed by Mr. Ed Lowitzki and Mr. Jake Cooper constituted illegal sexual harassment.

66. Other individuals who did not oppose sexual harassment were treated more favorably.

67. The reasons given for Mr. Grigsby's termination (e.g. the March numbers) were false and pretextual for retaliation.

68. Mr. Grigsby has suffered and continues to suffer damages.

II. **Retaliation for Reporting/Opposing Sexual Harassment in Violation of Title VII**

69. Plaintiff realleges Paragraphs 1-68 and incorporates them as if fully set forth in Paragraph 69.

8

III. **FMLA Retaliation 29 U.S.C. § 2601 *et seq.***

73. Plaintiff re-alleges Paragraphs 1 through 61 and incorporates them as though fully set forth herein as Paragraph 73.

74. Plaintiff engaged in a statutorily protected activity when he asked for information on FMLA and told Defendant that he would take FMLA for the remainder of April, and when he submitted the FMLA paperwork.

75. Plaintiff is eligible for the protections of FMLA. *Supra*, paragraph 4.

76. Defendant is a covered employer under the FMLA. *Supra*, paragraph 5.

77. Plaintiff met Defendant's legitimate expectations.

78. Plaintiff suffered a materially adverse employment action when Defendant willfully terminated him without regard to his rights on April 12, 2021.

79. Plaintiff was treated less favorably than similarly situated employees who did not request FMLA leave.

80. As a result of Defendant's willful retaliation against Plaintiff's rights under the FMLA, Plaintiff has sustained damages.

IV. **Workers Compensation Retaliation 820 ILCS 305/4(h)**

81. Plaintiff alleges Paragraphs 1-61 as if fully set forth herein as Paragraph 81.

82. At all times relevant, Mr. Grigsby was an employee before his injury.

83. He exercised his rights granted by the Workers Compensation Act 820 ILCS 305/1 *et seq*.

84. His discharge was causally related to the exercise of his rights under the Act.

**PRAYER FOR RELIEF**

WHEREFORE, for the foregoing reasons, Plaintiff respectfully requests that this Court provide the following equitable and monetary relief to the extent permissible under applicable law:

a. Enter judgment in Plaintiff's favor and against the Defendants;

b. Award compensatory damages including back pay, lost wages, future pecuniary losses, emotional pain, suffering inconvenience, mental anguish, other pecuniary losses;

c. Award reasonable attorney's fees, expert witness fees, expenses and Plaintiff's costs;

d. Grant such other and further relief as may be just and proper.

Respectfully submitted,

**Christopher Grigsby,**

Date: September 21, 2021

By: /s/ Amy S. Cramer
One of Plaintiff's Attorneys

Amy S. Cramer (ARDC # 6308140)
acramer@cramer-law.com
Thomas M. Cramer (ARDC # 6322468)
tcramer@cramer-law.com
Cramer Law Group
180 N. LaSalle Street
Suite 3700
Chicago, Illinois 60601
312-924-0219